# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DAMALI MUDINA KAFI,**
        **Plaintiff,**

    v.                                                        Case No. 15-CV-334

**SCOTT ECKSTEIN,**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff, a Wisconsin state prisoner proceeding pro se and in forma pauperis, brings this action under 42 U.S.C. § 1983 alleging that defendant, a state correctional official, retaliated against him for exercising his rights under the First Amendment. Defendant moves for summary judgment.

## I. BACKGROUND

I present the following facts in the light most favorable to plaintiff, as the non-moving party. Plaintiff has been in custody at Redgranite Correctional Institution since September 2013, when he was transferred from Green Bay Correctional Institution. At all relevant times, defendant was deputy warden at Redgranite.

In April 2013, while plaintiff was still in custody at Green Bay, a civilian advocate named Peg Swan wrote to him on behalf of her organization, Forum for Understanding Prisons (FFUP), and asked if he was interested in helping to bring a class action lawsuit against officials at Waupun Correctional Institution on behalf of inmates housed in segregation there. Plaintiff agreed to help.

In May 2014, Swan told plaintiff that she had brought FFUP's concerns about the conditions in Waupun's segregation unit to the attention of an investigative journalist

who had expressed interest in publishing a story on the issue. Plaintiff agreed to summarize accounts of inmates' treatment at Waupun that he had received.

Between July 20, 2014, and July 22, 2014, the journalist, Bill Lueders, published a series of articles about allegations of physical and psychological abuse by correctional officers against inmates in Waupun's segregation unit dating back to 2011. Lueders disclosed sources for the allegations, including letters from inmates to Swan, and quoted her throughout his articles. As part of the series, he also profiled her and FFUP.

On August 14, 2014, Swan received a letter from the Wisconsin Department of Corrections (DOC) suspending her visiting privileges pending an investigation into alleged violations of a DOC executive directive on the proper procedure for surveying inmates and a DOC rule prohibiting her from charging inmates for legal services or supplies. Around that time, defendant started investigating plaintiff's activities with FFUP and a group known as the "Legal Assistance Network," his relationship with Swan and other inmates associated with those organizations, and whether he or others were compensated for providing legal assistance to other inmates.

On September 8, 2014, defendant ordered that plaintiff's personal belongings and documents be confiscated from his cell and searched and that he be placed in temporary lockup (or "TLU")—"a temporary non-punitive segregated status," Wis. Admin. Code DOC § 303.20(22)[1]—pending an investigation into whether he had charged other inmates for legal assistance in violation of a DOC rule prohibiting "enterprises and fraud." *See* Docket No. 26-1, at 1 (citing Wis. Admin. Code DOC § 303.32). Notice of the order states that plaintiff was placed in TLU because defendant

---

[1] Unless otherwise noted, citations are to the 2014 version of the Wisconsin Administrative Code. Many DOC Code provisions have since been renumbered.

thought he might "impede a pending investigation" or that allowing him to remain in general population might "be disruptive to the operation of the institution." Docket No. 26-1, at 1; *see also* Wis. Admin. Code DOC § 303.11(4)(a), (b)).

On October 1, 2014, defendant issued a conduct report charging plaintiff with (1) "group resistance and petitions," (2) "unauthorized use of the mail," (3) "unauthorized transfer of property," and (4) "unauthorized forms of communication." *See* Docket No. 26-2 (citing Wis. Admin. Code DOC §§ 303.20, .30, .40, .48). The report stated that plaintiff had "been identified in a leadership role within a non-sanctioned group of inmates and a civilian (Mrs. Peggy Swan) who refer to themselves as the 'Legal Assistance Network,'"[2] described how Swan directed inmates seeking legal assistance to complete an application that appeared to be from FFUP and then sent completed applications to plaintiff for approval or denial, quoted correspondence suggesting that plaintiff had "a leadership and advisory role within the FFUP" and was "attempting to recruit other inmates," and claimed that plaintiff "intentionally utilized Mrs. Swan as a conduit to pass mail regarding the FFUP between inmates in the Wisconsin prison system. . . . with the intention of circumventing security staff from monitoring any and all co[r]respondence[] involving the FFUP." *Id.*

On October 23, 2014, plaintiff appeared at a major ("full due process") disciplinary hearing. *See* Docket No. 26-3. He pleaded not guilty to each of the charges. The hearing officer found it more likely than not that plaintiff participated in FFUP's "organizational structure" without written permission from the warden, as required by

---

[2] In his conduct report, defendant seems to conflate FFUP, Swan's external non-profit, with the Legal Assistance Network, an unsanctioned prison group that worked with FFUP or for which FFUP may have acted as a front, in certain respects. He clarifies the distinction between these groups in his reply brief.

DOC rules, and that he provided legal advice to other inmates by mail through Swan, in circumvention of DOC rules. *See id.* The hearing officer found plaintiff guilty of "group resistance and petitions" and "unauthorized use of the mail" (he dismissed the other two charges as redundant) and sentenced him to 120 days in "disciplinary separation."

Plaintiff appealed, and on November 12, 2014, Redgranite's warden reversed the hearing officer's decision stating only that the evidence did not support the charges. Plaintiff was released from disciplinary separation, the conduct report was expunged from his record, and he received back pay for the more than two months he was unable to work in the prison laundry because he was in TLU and disciplinary separation.

## II. DISCUSSION

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

To prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) he engaged in activity protected by the First Amendment," "(2) he suffered a deprivation that would likely deter First Amendment activity in the future," and "(3) a causal connection between the two." *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)).

Plaintiff argues that defendant placed in him TLU with limited access to his personal, legal, and religious property and issued a false conduct report because of his "jailhouse lawyering," contributions to Lueders's articles about Waupun, and

4

correspondence with Swan. Defendant argues that he conducted a reasonable investigation into credible allegations of misconduct and charged plaintiff with rules violations consistent with and supported by his findings.

### A. Protected Activity

Plaintiff has shown that at least "some of his conduct was protected by the First Amendment." *See Harris v. Walls*, 604 F. App'x 518, 521 (7th Cir. 2015). In general, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Accordingly, plaintiff has the right to help other inmates with their legal issues, *see Johnson v. Avery*, 393 U.S. 483, 487 (1969), and communicate with "persons outside of prison," including journalists, *see Pell*, 417 U.S. at 828, subject to restrictions "reasonably related to legitimate penological interests," *Shaw v. Murphy*, 532 U.S. 223, 225 (2001) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

### B. Deterrent Deprivation

Plaintiff has also shown that he suffered deprivations that could deter future First Amendment activity. *See Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). Defendant placed plaintiff in TLU for weeks, where he had limited access to personal, legal, and religious property. *See Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir. 2000). He then filed "major misconduct charge[s]" against plaintiff, subjecting him to "the risk of significant sanctions." *Brown v. Crowley*, 312 F.3d 782, 789 (6th Cir. 2002). Indeed, plaintiff spent nearly three weeks in disciplinary separation after the hearing officer found him guilty on two of those charges before the warden dismissed them.

## C. Causal Connection

The issue, then, is whether a reasonable jury could find a causal link between plaintiff's protected activity and defendant's adverse conduct. In First Amendment cases, "the burden of proof relating to causation is divided between the parties." *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013) (quoting *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011)). First, the plaintiff must show "that his . . . protected activity was a motivating factor in the defendant's retaliatory action," *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004), meaning that it was "a factor that weigh[ed] in the defendant's decision to take the action complained of" or that it was "a consideration present to his mind that favor[ed]" or "pushe[d] him toward[] the action." *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1006 (7th Cir. 2005). "The defendant can rebut . . . by showing that . . . the harm would have occurred anyway." *Greene*, 660 F.3d at 980.

**1. Jailhouse Lawyering**

Plaintiff speculates that defendant was motivated by his general jailhouse lawyering, but "mere speculation or conjecture will not defeat a summary judgment motion." *Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co.*, 544 F.3d 752, 757 (7th Cir. 2008) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)). Plaintiff's only evidence is that he "has been a litigious inmate" for years, "he has had a reputation for assisting inmates with legal matters" throughout his time in prison, and his "legal activities have been well known to [Redgranite] and [DOC] staff." Docket No. 18, ¶ 7. Even if this implies that defendant knew about plaintiff's legal activities, it does not suggest that he cared about them or that they pushed him to act.

## 2. Contributions to Lueders's Articles

Plaintiff also speculates that defendant was motivated by his contributions to Lueders's articles about alleged abuse at Waupun. But, nothing in the record suggests that defendant knew or cared about those articles. And, even assuming he did, nothing in the record suggests that he knew or cared that plaintiff contributed to them.

Plaintiff further speculates that Lueders's articles caused the DOC to investigate Swan (and revoke her visiting privileges), which caused defendant to investigate plaintiff (and punish him). In other words, plaintiff argues that the DOC's investigation of Swan was retaliatory, so defendant's related investigation of him was also retaliatory. While the record does show that DOC revoked Swan's visiting privileges and started investigating her a few weeks after Lueders's articles were published, mere "[s]uspicious timing" or "temporal proximity" is rarely sufficient to establish causation for the purpose of demonstrating retaliation. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (alteration in original) (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004)).

Also, even if the DOC's investigation of Swan was retaliatory, the motive of whoever instigated it cannot be imputed to defendant to show that his separate, if related, investigation of plaintiff was also retaliatory. *Cf. Reichle v. Howards*, 132 S. Ct. 2088, 2096 (2012) (citing *Hartman v. Moore*, 547 U.S. 250, 262 (2006)) (noting that "the causal connection in retaliatory prosecution cases is attenuated because those cases necessarily involve the animus of one person and the injurious action of another"). "Section 1983 creates a cause of action based on personal liability and predicated upon

7

fault," *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)), so "each Government official . . . is only liable for his . . . own misconduct," *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

### 3. Correspondence with Swan

Finally, plaintiff argues that defendant was motivated by his association and correspondence with Swan. As a general matter, this is undisputed. Defendant concedes that a primary focus of his investigation into plaintiff's alleged misconduct was the nature of his relationship with Swan and that he scrutinized plaintiff's correspondence. However, plaintiff still must show that defendant was improperly motivated by his *protected* activity, and nothing in the record suggests that he was. Indeed, the record shows that defendant was motivated not by plaintiff's exercise of his right to communicate with Swan but by his belief that plaintiff was exceeding that right in ways that threatened legitimate penological interests of institutional security and order.

### 4. Defendant's Rebuttal

Even if defendant did act from an improper motive of some sort, "he is not liable despite his impure heart" if he had a legitimate and compelling reason for acting that "would have caused him to take the same action even if he had not harbored the improper motive." *Hasan*, 400 F.3d at 1006.

The record shows that defendant initially investigated whether plaintiff was compensated for providing legal assistance to other inmates and whether he was soliciting other inmates to join a non-sanctioned group. DOC rules clearly prohibit "[c]ompensation of any kind for . . . inmate to inmate legal services," businesses and enterprises "whether or not for profit," and participation "in any group activity which is

not approved by the warden." Wis. Admin. Code DOC §§ 303.20(1), 303.32, 309.155(5), 309.365(2). Plaintiff does not dispute that these rules, to the extent they restrict inmates' First Amendment rights, are reasonably related to legitimate penological interests of institutional security and order. *See Turner*, 482 U.S. at 89.

The record also reflects that defendant placed plaintiff in TLU because he believed that plaintiff's continued presence in general population would impede the investigation or otherwise be disruptive to prison operations. This conduct is expressly permitted by DOC rules, *see* Wis. Admin. Code DOC § 303.11, and plaintiff does not dispute that it, in general, this practice furthers legitimate penological interests. Plaintiff argues that he could not have impeded the investigation because he did not know about it until after he was placed in TLU. But, the record shows that an investigator interviewed plaintiff about his alleged misconduct the day after he was placed in TLU, which suggests that defendant did not place him there until the investigation warranted interviewing him about it (thereby disclosing the investigation to him).

The record shows that defendant issued misconduct charges that reasonably reflected the findings of his investigation. Though he seems not to have found evidence of improper compensation, he found correspondence in which Swan repeatedly referred to an in-prison legal assistance network and implied that plaintiff influenced (if not outright decided) whether and which of his fellow inmates received assistance from FFUP. He found correspondence in which another inmate expressed interest in "joining in [plaintiff's] cause with FFUP." And, he found what he believed to be a pattern of plaintiff communicating with other inmates about group activities through Swan in order to avoid detection by security staff, who normally only monitored inmate-to-inmate mail.

9

Plaintiff cannot meaningfully dispute that unsanctioned group activities, inmate-led groups, one inmate controlling other inmates' access to a scarce resource like outside legal assistance, and covert communications present institutional risks and that prison officials can reasonably restrict such activities in light of legitimate penological interests.

Plaintiff disputes the accuracy of defendant's conclusions—arguing, for example, that he never held a formal leadership role in either FFUP or the Legal Assistance Network and that he never used Swan as an intermediary to send covert mail to other inmates—but he misses the point. Whether defendant arrived at accurate conclusions based on the information that he had, the record shows that he acted on reasonable inferences drawn from that information and was motivated by legitimate penological interests, rather than or regardless of any retaliatory animus he may have harbored.

### III. CONCLUSION

For the reasons provided, **IT IS ORDERED** that defendant's motion for summary judgment (Docket No. 22) is **GRANTED**. The Clerk of Court shall enter judgment.

The court expects the parties to closely review all applicable rules and determine what, if any, further action is appropriate in this case.

Dated at Milwaukee, Wisconsin, this 29th day of September, 2017.

/s Lynn Adelman
LYNN ADELMAN
District Judge